ROBERT C. BUELL & COMPANY *v.* CORNELIUS J. DANAHER, ADMINISTRATOR, ET AL.

MALTBIE, C. J., AVERY, BROWN, JENNINGS and ELLS, JS.

Argued January 10—decided March 7, 1941.

*Cyril Coleman,* with whom, on the brief, was *Julius G. Day, Jr.,* for the appellant (plaintiff).

*Harry Silverstone,* assistant attorney general, with whom, on the brief, was *Francis A. Pallotti,* attorney general, for the appellees (defendants).

ELLS, J.   This is an appeal from a judgment of the Superior Court confirming the action of the administrator of the unemployment compensation law in assessing the plaintiff because of certain salesmen claimed to be its employees, and the question involved is whether they are servants of the plaintiff as that term is used in the Unemployment Compensation Act.

The material facts found by the trial court are as follows: The plaintiff is a partnership engaged in a brokerage business in securities. It does not buy or sell for its own account. It maintains an office in

Hartford where it employs bookkeepers, stenographers, a telephone operator, a statistician, a cashier and a person who executes the orders which it obtains. These are concededly employees within the meaning of the act. It also employs a number of security salesmen, and the assessment in question was made pursuant to General Statutes, 1939 Sup., § 1334e, with reference to compensation paid by the plaintiff by way of commissions on the sale of securities made by them. The plaintiff's income or gross profit consists only of commissions upon orders executed by it for customers. These orders are obtained by the three partners, by the twelve salesmen, and sporadically by members of the office staff. The contracts between the plaintiff and these salesmen were oral and terminable at will. In engaging a salesman the plaintiff is more concerned with his general ethical procedure, his good moral character and his previous experience than with where he is going to work, the number of hours he works each day, and whom he is going to see. There is no discussion or understanding as to a minimum volume of business, specific number of calls to be made upon prospects, hours of work, or attendance at sales conferences; the salesman is expected however to produce orders, to devote himself to the business of selling securities, to come into the office in the pursuit of the business every day, and to attend occasional sales conferences. The hours of his coming and going are not fixed. He makes no actual agreement to devote full time to the work, but in practice there is only one salesman who does not work full time. This exception is a man who devotes about 70 per cent of his time to the plaintiff's business and 30 per cent to the insurance business. Each salesman has a desk in the office, and if he does not come in for two or three days the cause of his absence is checked up by the plaintiff. Desks,

telephone and ticker service, statistical information, consultation rooms, business cards and order blanks are furnished by the plaintiff at its own expense. The salesman pays three dollars for his license, and such traveling expense as he may incur in obtaining business. He has no specific territory, and a large portion of the business is done by the use of the telephone. The plaintiff agrees to pay him one-half of the gross profit which it receives on the business he brings in. There is no salary and no drawing account, and nothing is agreed upon in event of a loss—which would occur only as a result of a clerical error. If one of the partners gets information as to a prospective customer he turns it over to a salesman, who is expected to follow up the lead. The plaintiff advises the salesmen as to the price at which securities are to be bought and sold, keeps them informed as to the trends of various securities, and expects them to use that information in advising customers and in securing business. When the salesmen get orders, they are turned in to the plaintiff, who confirms them in its own name. Thereafter the salesman has no further connection with the transaction. Payment is made by the customer directly to the plaintiff. Great care is used in selecting customers, and the plaintiff retains the power to terminate business relations if it considers a customer unsatisfactory.

Certain of the foregoing findings of fact which are attacked are not supported by direct testimony, but they are justifiable and reasonable inferences from the evidence as to what the oral contract really was and as to the actual conduct of the business. For this reason, among others, we cannot make the corrections in the finding which the plaintiff requests.

The plaintiff claims that these salesmen are carrying on an independent employment and occupy a posi-

tion in the nature of that of independent contractors. The defendant contends the relationship is that of master and servant. The governing statute, § 1334e, supra, provides that " 'employment' . . . shall mean any . . . service performed under any express or implied contract of hire creating the relationship of master and servant." Various elements may enter into the determination of the question whether one who performs services for another is his servant or is exercising an independent employment. Restatement, 1 Agency, § 220. The many decisions on this subject are determined by the facts of the particular situations presented, and sometimes one and sometimes another fact has been regarded as of predominating weight. *Northwestern Mutual Life Ins. Co.* v. *Tone*, 125 Conn. 183, 2 Atl. (2d) 640. That case held that certain insurance agents, working under somewhat similar conditions to those surrounding the plaintiff's salesmen in the case at bar, were not within the act. It is to be noted that that case was reserved for the advice of this court on an agreed statement of facts while the case at bar resulted in quite a different finding made by the trial court after a contested hearing. The determination of the status of an individual as an independent contractor or employee is often difficult (note, 124 A. L. R. 682) and, in the absence of controlling considerations, is a question of fact. *Francis* v. *Franklin Cafeteria, Inc.*, 123 Conn. 320, 326, 195 Atl. 198.

In *Beaverdale Memorial Park, Inc.* v. *Danaher*, 127 Conn. 175, 179, 15 Atl. 17, we say that "the fundamental distinction between an employee and an independent contractor depends upon the existence or nonexistence of the right to control the means and methods of work," and cite *Norwalk Gas Light Co.* v. *Norwalk*, 63 Conn. 495, 524, 28 Atl. 32, in which this distinction is further elaborated. In the latter case we held that

the reservations of control being but partial, and existing in certain respects only, did not prevent the existence of the relation of contractee and independent contractor; that the general control over the work, as to the manner and method of its execution, the oversight and direction of the performance of the actual manual labor, remained in the contractor; that the persons doing the work were his servants, not those of the defendant, and that these considerations relating to general control constitute the true test by which to determine whether the relation be that of employer and contractor or that of master and servant. This is the basis of the Beaverdale decision, for there the salesmen were subject to the control of Beaverdale in certain respects only, but the general control was in Sexton, the contractor who hired them. In *Jack and Jill, Inc.* v. *Tone*, 126 Conn. 114, 119, 9 Atl. (2d) 497, we say the controlling consideration whether or not the relationship of master and servant exists, or that of independent contractor, is: " 'Has the employer the general authority to direct what shall be done and when and how it shall be done—the right of general control over the work'," and cite the applicable cases.

Applying these settled principles to the facts of the present case, we conclude that there are several particulars in which the plaintiff retains the right of control over the means and methods of the doing of the work by its salesmen. The plaintiff itself hires and pays them. It furnishes the office and the facilities for their work, except transportation. It has the right to designate what securities the salesmen shall sell. It furnishes them with information which they were expected to use as a part of their method of making sales. The plaintiff retains the power to terminate business relations with any customer obtained by a salesman if it considers him unsatisfactory. The plaintiff keeps

the customers' accounts, sends out the bills and collects the money. The trial court, in its memorandum of decision, aptly said: "On the whole the work which the salesmen are doing is the business of the plaintiff. The advancement of that business depends very largely upon the method and manner of the doing of their work by the salesmen. It is therefore highly essential to the plaintiff that it have the right to control the conduct of its salesmen in the doing of its business and it accordingly must be inferred in reason that it is implicit in the contract of hiring the salesmen that the plaintiff does have that right. And certainly the plaintiff has the power to enforce that right in that it holds over the salesmen the threat of discharge if they do not do their work to the satisfaction of the plaintiff." We cannot hold that the trial court could not reasonably reach the conclusion it did.

The plaintiff in its brief makes the contention that the statute in question is a taxing statute and therefore should be strictly construed. That the purpose of the statute is remedial in character is clear. It is therefore to be construed liberally as regards beneficiaries, in order to accomplish its purpose. *Powers* v. *Hotel Bond Co.,* 89 Conn. 143, 146, 93 Atl. 245; *Bradley* v. *Fenn,* 103 Conn. 1, 4, 130 Atl. 126.

The plaintiff, proposing to use in argument, as a precedent, a ruling by the deputy commissioner of internal revenue of the United States that the salesmen here in question were not employees of the plaintiff within the federal Social Security Act, offered in evidence a copy of a questionnaire, with the answers made to it, sent by it to the federal authorities for the purpose of showing the factual situation upon which the ruling was made, claiming that the facts were the same as those in evidence before the court. The court refused to admit the questionnaire and the plaintiff

has assigned this as error. The ruling of the deputy commissioner was in no way binding upon the trial court, which could decide the case only upon the facts before it and the principles of law in effect in this state. The ruling would, at most, be merely instructive upon the question of law before the court. 21 C. J. S. 354. It was not obliged to regard it at all, and if it did so the weight which it would attach to it as an aid in arriving at its own decision is entirely a matter for it to determine; and this is true as to the extent to which it would inquire into the facts upon which the ruling was made. Error cannot be based upon the failure of a court to consider a decision upon a similar state of facts made in another jurisdiction unless the law of that jurisdiction is involved in the issues on trial, and still less upon its failure to consider facts involved in such a decision.

There is no error.

In this opinion the other judges concurred.